Good morning, ladies and gentlemen. We are ready to hear our first case for this morning, the League of Women Voters of Indiana against Connie Lawson. And I believe the floor is yours, Mr. Kraft. Thank you, Judge Wood. May it please the court, Aaron Kraft for the state. This appeal is less about the meaning of the NBRA and more about the equitable authority of federal courts. Indeed, the state and the organizations agree that absent confirmation or the notice in waiting procedure, the NBRA requires some voting official in in Indiana to have a copy of the voter's signed authorization of cancellation before canceling a voter's registration. Now, Mr. Kraft, am I am I correct in thinking that only 11 states provide that like the Virginia type language, the language says, and I wish to cancel my registration in any other place? I believe that is true, Your Honor. I don't think every state has adopted that, and I don't believe the federal registration form has that language. So there are 11 states that do, but everybody else, the other 39, and maybe miscellaneous jurisdictions, D.C., Virgin Islands, et cetera, do not. That's my understanding. That's our understanding, Your Honor. Okay. And it sounds like, Mr. Kraft, let me just pick up on that. It sounds like you agree that if it's one of the other states, the other 39 states that don't have this certification language, that that is not sufficient in and of itself to confirm that the voter does not want to be registered in Indiana anymore. Is that correct? Yes, that's correct, Judge St. Eve. As this court explained in Common Cause 1, the fact of another registration does not, in and of itself, authorize the cancellation. That's why our statute looks for the authorization of cancellation. And really, the only dispute in this case is whether Act 334 requires the state to have the signed authorization of cancellation in every case. So can I ask you this question? I mean, you just, in your tone of voice, emphasized the word requires. And I've spent a fair amount of time preparing for this argument, staring at subsection F, and particularly F2. And I am at a loss to find any requirement. I mean, there could be a local county official who asks for that or decides not to ask for it in a particular case. But short of rewriting the statute, which would be an extraordinary thing for a federal court to do, I just don't see the requirement. So I think the statute is ambiguous. And I want to be clear on that. We are not suggesting that the statute clearly and unambiguously supports our view. But I don't see even the ambiguity. So the first line of F, the county voter registration office may rely on written information provided either directly by a state. So in this discussion of written information, written notice, you can look through the rest of the statute, and it does not anywhere include some requirement that there be a statement from the voter. I don't really actually care whether the statement from the voter, at least for present purposes, purposes of this question, whether the statement from the voter was made to the second state or whether the statement from the voter was made to the state-level people in Indiana or whether the statement from the voter was made to a county person. I don't see it anywhere. So the way we read the statute, Your Honor, is that the introductory clause of F refers to written information and that that written information is what both the state and the sort of flows consistently throughout the statute. Now, admittedly, F2 uses the term written notice instead of written information, but we think that that's just inartful draftsmanship and that we read the written information to be the same thing. And that avoids- But Mr. Craft, even if you read written information to be the same thing, doesn't the plain language of F1 suggest that or assume that there is some written information that could be provided that doesn't include a copy of the voter's signature? Because F1 refers back to this information and then goes on to say you must also provide a copy of the voter's signed registration application. I see your point. I guess we're reading the statute as basically taking that idea of written information in F1 and being the same idea in F2 to avoid a structural asymmetry in the statute. But that's my question. The information in F1, which I assume your argument is based on your briefs, that that information is the same as written information. And let's assume that's the same as written notice, just for purposes of argument. If the written information in F1 included the signed out-of-state voter registration where the individual is authorizing cancellation, then why would you have to say in F1 that that information also has to include that certification? So I guess I was reading the, I see the point. I guess what I was viewing, the way we view the statute is that F1 is really just talking about if the information is directed from out-of-state to the county, this is what it has to be. And we think the same information directed from out-of-state to the election division has to be the same thing. Because it just doesn't make sense. But your argument is, and I'm sorry to interrupt, but your argument is that 5F, that first sentence that says the county voter registration office may rely on written information. I understand your argument to be that written information has to include the authorized cancellation. Correct? Yes. So if that's true, when F1 refers back to that information, under a plain reading, why would you need to have the clause after the comma that says it also has to provide the individual's authorized cancellation? Well, I guess I'm reading that what comes after the comma is defining the information. But the problem is, excuse me, but the problem is it doesn't, and it actually, your reading creates difficulties with subpart 2 as well. But I actually want to go back to subsections A to C of the statute. When you look at this idea of written notice or written information, and I'll certainly, for this present purpose, assume that all means the same thing, the written information that Indiana has is going to be this data, the IDEA data that they have, not something from the voter necessarily. So it's the data that they're going to be sending along, which, and on top of that, the county is instructed to presume, the county should consider this notice as confirmation that the individual is registered in another jurisdiction and has requested cancellation, even though you have just agreed earlier that in 39 states, there's no reason at all to think that there's a request for cancellation. So I think the importance of this statute is that, yes, your description of A through C is correct, but when you look at subsection D1, that's where the IDEA report comes into play, is that it's that sort of initial flagging. But it's D3, that third step that was missing in the prior statute, that requires the county or the state to go further and verify that the voter not only registered in another state, but authorized the cancellation. But you wouldn't need to, if F was read the way that you're talking about it, because an election division would never forward written notice from another state to an Indiana county official if that written notice didn't include a request for cancellation. The problem is that another state is going to furnish notice under this IDEA program, which frankly looks to me quite a bit like cross-check, but put that to one side. But you're not going to get the notice if there's no request. You could forward any written notice from another state to a county, and the county is supposed to take that as confirmation that the person is requesting cancellation, even though that's exactly the presumption that we said couldn't be sustained in the first round of this case. Well, and I think that the important thing about F2, Your Honor, is that it does not say what triggers the election division's transmission of anything onto the county. But let me give you an analogy. You're well familiar, I'm sure, with the area of mootness. You'll recall that that's been an argument here. But what we know is that if there's discretion to either follow or not follow a contested line of action, then the case isn't moot. You have a case that needs to be adjudicated, and there is absolutely nothing in Part F that requires the election division to obtain a direct instruction from the voter. I don't care how many hands it went through, but you've got to find that direct instruction from the voter before you can go ahead with the removal of that voter without following the NVRA procedures. We understand that, Your Honor. And just to clarify, the reason we haven't raised mootness as a sort of separate argument in our briefing is because it really doesn't get us anywhere unless you agree with our interpretation of the statute. Now, and I also want to, you know, we can see there are problems with our interpretation. We think there are also problems with the organization's interpretation, and that is why we think the statute's ambiguous in that our reading is reasonable because it avoids a conflict with the NVRA. It's consistent with the presumption that the General Assembly responded to this court's concern and did not act in defiance of them. We also think that our interpretation harmonizes F with the rest of Indiana voter registration law, which in general requires a written authorization before cancellation. So before you go on in that vein, I, you know, we have read your briefs. I would like you to spend just a minute before you have to sit down on the assumption perhaps that we're not persuaded by these merits arguments, but you've also raised a concern about the scope of the injunction, and I would like you to address that if you would. Thank you, Judge Wood, and that's fine. We, if you disagree with our interpretation, the injunctions still need to be reversed. They're overbroad for two reasons. First, they enjoined subsection F2 on its face, but I think everyone agrees that even if F2 is broader, it certainly includes a written authorization of cancellation from another state that is sent to the election division and then forwarded on. That would be, it would be lawful under the NVRA for a state to remove or to cancel registration in that circumstance. I'm not sure everyone agrees with that, but I'll certainly take that to be the state's position. I have no problem with that much. The second reason it's overbroad is that the injunction also enjoins subsections D, E, and F1, and all D does is say that the county has to verify that the voter has authorized cancellation. E says if they make that determination, they shall cancel the registration. If not, they have to go through the notice and confirmation or notice and waiting procedure. It didn't look like that below was the focus of the briefing or the arguments. It looked like F2 was the focus of both sides' arguments below. Is that a fair characterization? I think that is a fair characterization, Your Honor, which is why it's somewhat puzzling that the district court thought it needed to enjoin those other provisions. Admittedly, our position below was that no injunction should be issued, but this court has long held that general waiver principles give way when we're talking about the lawfulness of an injunction. Courts have an independent obligation to issue injunctions that are narrowly tailored to remedy only the violation, and the only conduct that this statute would permit under the organization's interpretation that violates the NVRA is if under section 5.5 F2, cancellation could occur without having the signed form from the other state authorizing removal. So the injunction, if the court were to agree with the organization's interpretation and disagree with ours and determine that some injunctive relief is warranted, it should go no further than that. I think that the organization's position, to the contrary, was that this all works together as a whole, and even in the determination whether the individual has authorized the cancellation, there's nothing about whether that's the subject of an inference from the second registration to I hereby authorize you to tell Indiana that I'm canceling. I never want to go back to Indiana again. I never want to look at it. So please remove me from the voter roll. So you don't quite have the specificity about directness even in D3. So if I understand the district court's reasoning at all on this, I think that's what it was doing. Well, I think the problem with the word directly in the injunction creates an independent problem with vagueness because this court specifically left open the meaning of that and whether a form that goes through multiple officials' hands would qualify. It wasn't a focus of the earlier opinion, and what I said a few minutes ago favorably to the state was that if you can trace it back to the voter herself or himself saying, I wish to cancel my Indiana registration, then if the voter gives it to his lawyer or if the voter gives it to his mother-in-law or somebody sends that piece of paper from the voter to the Indiana authorities, I'm willing to call that direct. And so in the 11 states, maybe the please tell Indiana that I wish to cancel my registration. Now, Virginia may want to do that or not. I mean, I don't even know if Virginia or the other states in this IDEA program regularly transmit this information. If they do, then it's just Indiana's version of crosscheck, I think. Well, and I think as this court pointed out in Common Clause 1, the problem with crosscheck was the existence of crosscheck itself. It was that Indiana relied exclusively on crosscheck, and this statute doesn't do that because D3 and then F, again, in our view, but F1 clearly requires that the state have the signed authorization of cancellation. If the state doesn't have that, it has to either, it has to follow up with the voter through the notice and procedure. So, and the thing about directly, I think that, you know, whether it goes through the U.S. mail or through UPS or through other states, it's still a communication from the voter making a request or approving the cancellation of the prior registration. And so that would satisfy the NVRA. I would like to reserve a few minutes for rebuttal. Thank you. That would be fine. Thank you very much. Ms. Perez, are you the first one? Yes, ma'am. Myrna Perez for the voter organizations, and I am going to cover the issue of statutory interpretation and my colleague will issue, address issues of remedy and justiciability. Critically important that this court acknowledge that the state has not at all committed or promised to engage in an NVRA compliant way. At best, they are urging the court to find a tortured reading of the statuted issue and to find that that's plausible. But given over a year of dealing with 334, they have not done one thing. In fact, they are appealing a summary judgment motion and an injunction that comports with the very reading that they are asking this court to find plausible. Now, am I correct that they did not incorporate the reading they're now urging in the revised Indiana voter registration guidebook? They did not, Your Honor. They did not issue guidance that they were statutorily required to. The examples of what would be appropriate written notices from the sponsor did not include registration forms. The drafter of the legislation did not confirm that a registration form was required. Statements of a lawyer is not evidence and the district court below had to construe the party and was not persuaded that Indiana was going to act in an NVRA compliant way. They disputed what the statute meant below. And right now, again, they are still not finding themselves can act in an NVRA compliant way. So what about Indiana's argument that either if the cancellation form comes in from one of those 11 states that have this very direct statement from the voter, or perhaps just some public spirited county official who says, well, I'm not taking anybody off the books until I hear from them. Is that enough to defeat a facial challenge? Your Honor, I want to leave aside whether or not a facial challenge is an appropriate inquiry when this is not a constitutional question. These are this is issue of straight up statutory interpretation. You just say this is preemption. Is this right? This is just a straight up statute. Yeah, this is a straight up statutory analysis issue. And more moreover, the fact that someone can imagine an NVRA compliant scenario that does not strictly violate the text of 334 does not mean that 334 permittably requires compliance. This court made very clear in Common Cause 1 that it needed to be a direct communication from a voter. 334 violates the NVRA just the way that 42 did, Your Honor. So what if Indiana passed a statute, and I'll phrase this hypothetically so as to not say one thing or the other about 334. Suppose Indiana passed some implementing statute that says the following communications will be sufficient to show a direct communication from the voter. One, a letter from the voter to the state registrar indicating that they wish to cancel registration. Two, the signing of a voter registration form in another state if that form also includes an affirmative statement that the voter wishes to cancel all registrations in other states. And maybe there's a three and a four too. But in other words, if the state adopted a procedure under which the voter could delegate the responsibility to send the message back to Indiana that they want to cancel, would that comply with the NVRA in your view? Yes, Your Honor. In fact, we would have expected something like this in the implementing language that they were required to issue. We would have expected something like this in a stipulation that never came. We would have expected something like this in testimony from either the sponsor or the drafter. None of that happened. Instead, what you're hearing is an argument that only has appeared in the course of appellate briefing about a tortured reading and about what the statute means. One of our clients specifically indicated the flaws in the text in multiple ways, twice before hearings, in a public argument. Lawyers notified opposing counsel. The state made no attempt to try and address the infirmities. And right now they're offering a legal position, which again is not facts and was not before the lower court below, but there is some plausible interpretation. Ambiguity under Indiana state law needs to be construed against the drafter, which the state was. We only want to protect our voters. That is the only thing that we are asking for. And we have a clear direction from this court that there needs to be written communication directly from a voter or there needs to be notice in waiting. And the state thus far has not provided the barest shred of evidence that they are going to act in a way that is NVRA compliant. Ms. Perez, if there is a construction of the statute, as the state argues, that would permit the election division to receive written authorization of cancellation by the that would comply with the federal statute, given that the statute hasn't been implemented yet. And I'm not going to put a facial challenge or pre-enforcement as applied challenge on it, but just under Arizona v. Washington or Gonzales, how have you met the likely to occur requirement that would allow us to take this up at this point? Well, Your Honor, the concern is discreet and well-defined. We know that... That's only part of it, though. You also have to establish the likely to occur, which is what my focus is. Right. We know that Indiana is going to be doing list maintenance. We know that they are operating under an injunction. And if that injunction is lifted, the only evidence that we have about how they're going to act is the way the sponsor and the way that the VR guide indicated that they would act and the way that the drafter, who is responsible for implementing the legislation. And to be very clear, the drafter, who is responsible for implementing the legislation, did not commit to requiring an out-of-state registration form. On top of that, we have the plain text, which doesn't require it. But if the plain text may not require it, but if the plain text of F-2 permits it, again, given that this has not been implemented yet, how have you established likely to occur? Do we need something else to meet that likely to occur under Gonzales that you have to establish? No, Your Honor. And I believe my colleague, Sophia, will have more to add to this. But the reason we don't, Your Honor, is because we have a statute that on its face violates the NBRA. We have the implementers indicating that they do not intend to comport. We have all of the administrative action to gear toward enacting the statute that does not comport with the NBRA. And we have a state. It doesn't seem like there's been a lot of administrative action yet. Your Honor, there hasn't been, but they were required to do so. So the fact that they have not acted in accordance with their statute in adopting implementing legislation indicating compliance is highly relevant. Is that because of this lawsuit? Is that why they can't take further action? I'm sorry, let me finish. I know it's hard over Zoom. Is the reason or is there any evidence to support the argument that they haven't taken these actions as required under the statute because of this lawsuit? No, Your Honor, and I would point out that nothing in the injunction prevents them from doing the legal argument that they are taking right now. Nothing about the injunction precludes them from taking a voter registration form and using that as the basis of moving voters. It is a mischaracterization of the injunction to say that they can't do anything. They merely can't do F-2 and the way that D and E. Well, the injunction is much broader than that. The injunction applies to way more than just F-2. No, but it's D, E, and F. Remember, Your Honor, D has to do with what needs to be determined. E has to do what happens once they make that determination. F is the way in which they can make that determination. So the three fit together. But importantly, the state has not done one single thing, including the issuance of an affidavit or a stipulation, that they are going to conform with the NVRA and we need an enforceable way of protecting the rights of our voters. We have that under an injunction. An injunction whose reading state claims that they don't dispute. We are here because 334 violates the NVRA the same way that 442 does. And the state has done nothing but issue defiant actions to give this court and district court below very real concern that if given one inch, they are going to defy the NVRA again. All right. I think you're near the end of your time, Ms. Perez, so maybe we should switch to your colleague. I'll let you finish that thought, though. Your Honor, I'm fine. Thank you so much. All right. Thank you. Ms. Lakin? Yes, Your Honor. Good morning, Your Honors. Sophia Lakin for the Voter Organization. Turning very quickly to the question about whether or not this application is likely to occur, such that it is a proper reinforcement challenge, I would point out, in addition to everything that Ms. Perez pointed out herself, that this is an unambiguous statute and where the text is unambiguous, we need not look any further. What if it's ambiguous? What if we find it ambiguous that, although it's not required that the state have the cancellation directly from the voter, but a reading of F-2, it's possible that, so the statute doesn't say you don't have to have this, but if we find that aspect ambiguous, I don't think you can use the plain language of the statute for your likely to occur argument. Your Honor, I would add that the state itself even agrees that the statute plausibly permits removals in violation of the NBRA, as we've stated. And as Ms. Perez pointed out, all the evidence that we have in the record indicates that it will, in fact, be implemented in a way that violates the NBRA. And I guess that's my question for you. What evidence do you meet the likely to occur standard that the Supreme Court has set out in Gonzales, given that this statute has not been implemented yet? Your Honor, we would argue that we've submitted a motion for summary judgment. We laid out all the pieces of evidence about how this statute would be implemented based on what was available. What's the legal principle on establishing likely to occur? I'm not looking for what you have done. I'm looking for a legal principle for us to apply on likely to occur. Your Honor, here it's that there is a reasonable expectation that the actions that the organizations, the voter organizations, have taken in response and in preparation for the implementation of a statute that they have no reason to believe will not be implemented in the way that the text permits. So let me ask, sort of following up on that, you know, obviously there's a legal standard and you've put into the record evidence. And I want to go back again to the Indiana Voter Registration Guidebook, which was revised to take into account Act 334. But in that revision didn't offer the saving reading, if we assume that's what it is, that the state is now suggesting that we have. And so there's that. And there's also just the language of the first, the primary part of F. The county voter registration office may rely on written information provided either directly by a voter registration office in another state or forwarded from the election division. So then we, you know, we get into the rest of this language. And I guess it's maybe what I'm wondering is, is it the discretion not to have a direct statement from the voter enough to justify this pre-implementation injunction? Your Honor, you're exactly right about the Voter Registration Guidebook. And I'd also note that the guidebook describes F-2 as an exception to the requirement that you need a signature of the voter for authorization. So in other words, any time the state wants to, under this exception, it can proceed without a signature from the voter. That's our understanding of F-2, so long as it comes through the IED instead of directly to the counties themselves. And, you know, if there were a statutory definition of the term doesn't count as written notice unless there is a voter signature requesting cancellation, would we be here? I'd have to, I want to think about that. What I'm getting at is that the term written notice, if I look at the statute, seems to refer to these confidence factors, the IDEA data, not something that actually is a communication from the voter. But I guess everybody agrees that in those states where the voter actually says, I wish to cancel my Indiana registration, that that's good enough. Do you take issue with that? No, Your Honor, we don't take issue with that. One of the concerns, I think, is left with the definition of written notice, although that could presumably be one way to solve the problem with respect to the term authorization of the voter to cancel that registration without following the NVRA notice process. The statute has been pointed out doesn't contain a definition of authorization of the voter. And while F is there to provide some examples, the problem that we have is that it includes F2, which the way that we read the statute expressly permits the state to cancel voters without hearing directly from the voter or following the NVRA notice process. That is why. Are you making anything of that final sentence of F2, a copy of the actual voter signature is not required to be provided to the county for the voter's status to be canceled if the written notice is forwarded by the election division? Yes, Your Honor, that language itself demonstrates very clearly, especially in contrast to what is required under F1 to demonstrate that the state's not contemplating having that communication made by the voter or possessing it before a county is permitted to remove that voter and the county doesn't need to follow the NVRA notice process. So the county would have no information other than relying on the state to have verified whatever the mysterious term written notice may mean. And that's absolutely correct. And just like, did I misunderstand what you just said? Are you challenging under F1 the meaning of whether an individual authorizes cancellation? Because that seems to be coming directly from the register to vote form from the other state that specifically says I hereby authorize cancellation. I have a couple of examples before me where they say that. No, Your Honor, that we're not challenging that what occurs under F1 is authorization. And Ms. Lakin, if the final sentence of F2 is the offending language, can SEA 334, the remainder without subsection F2, can that operate within NVRA guidelines? Your Honor, this gets to the point that I was making before about the lack of a definition of authorization in the statute and the fact that it includes the offending language in F2. That's demonstrating that authorization without some sort of limitation is encompassing removals without hearing directly from the voter. Well, obviously, this question goes to the scope of the injunction then. D, E, and F1, are they a matter of challenge by the voter organizations or not? Your Honor, D, E, and F together comprise the voter removal program. But could I push back, Ms. Lakin? I have the same concern I think that Judge Brennan is expressing. D and E have largely been in Indiana law since even before Act 442. So it's hard for me to see what your objection to them is in and of themselves. Your Honor, it's the inclusion of F2 and the history of this litigation where we know that the state has attempted to get around the requirements of the NVRA that's causing concern about having an express injunction that makes very, very clear that the state cannot remove voters without direct notice from the voter or the notice process. So let me circle back. We've been here twice. So Ms. Lakin, let me circle back then to the original question. If F2 is excised, can the remainder of Act 334, is that within NVRA guidelines? Your Honor, if it were just those provisions, D, E, and F1, and those were just the procedure that would be followed, then that is correct. But F is non-exhaustive. And so there are many other ways a county could constitute authorization of the voter under the statute. And so while we think the district court's injunction provides the clarity that's needed here and warranted under the circumstances of the case, if this court believes that the injunction is overly broad, we are certainly asked that this court remand to the district court for an error or injunction, something the state itself could have asked the district court to do many times before. But we ask that it provides that clarity and leaves no doubt that Indiana must hear directly from the voter, have a signed communication made by that voter, or follow the notice process in order to remove voters on the basis of changed residence. For these reasons and the reasons in our brief, we ask that this court affirm the district court's injunction and the judgment below. Thank you. Thank you very much. Anything further, Mr. Kraft? Yes, Judge Wood. I'd like to make a few points. First off, on the evidence required to show it's likely to occur. The reliance on the representative's letter and on Mr. King's statements in the hearing are improper for two reasons. First, it's well-established under both Indiana and federal law that the statements of a single legislator or someone testifying doesn't signal legislative intent. But more importantly, nothing they said is actually contradictory. Mr. Wesko, Representative Wesko, attached notices to his letter, but he did not say in his letter that these notices would suffice under F-2. So what do you think the test is? How do we determine that? I think there needs to be, I think what would have been a legal test. That might be evidence you're arguing would support it, but how do we apply a legal test to determine likely to occur? I think that it's just, you know, given a broad statute, is there evidence that the state officials have taken the position that they will implement it in the unlawful way? And there's no evidence of that here because this sort of was rushed through a second summary judgment proceeding without any discovery. With regard to the guidebook, it calls F-2 or subsection F an exception, not to the written authorization requirement, but to the ordinary requirement that the voter authorize cancellation on an Indiana form. And actually, 5.5 allows this to happen on another state's form, not an Indiana form. I see my time is up. Unless there are no further questions, the state asks that the court reverse the injunctions. All right. Thank you, Mr. Kraft. Thank you, Ms. Perez. Thank you, Ms. Lakin. We will take the case under advisement.